UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICK TSCHERNJAWSKI, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) ) | Jury Trial Demanded |
| SHARKNINJA, INC. | ) ) ) | |
| Defendant. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Rick Tschernjawski ("Plaintiff"), individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Defendant SharkNinja, Inc., and, in support thereof, alleges as follows:

### INTRODUCTION

1.      SharkNinja manufactures, markets and sells kitchen appliances for home use, including a line of multi-function pressure cookers called the Foodi OP300 Series (hereinafter, the "**Products**")[1]. SharkNinja touted these Products as revolutionary kitchen appliances, combining multiple cooking functions into a single unit. Marketed as an all-in-one solution, the Products aimed to simplify meal preparation by integrating pressure cooking, air frying, slow cooking, and more. However, despite their widespread popularity, the Products were defectively designed, as the pressure lid could be opened while the unit was still pressurized, leading to the sudden release of hot contents (the "**Defect**"). This Defect has led to over one-hundred reported burn injuries,

---

[1] The model numbers for the Products are OP300, OP301, OP301A, OP302, OP302BRN, OP302HCN, OP302HAQ, OP302HW, OP302HB, OP305, OP305CO and OP350CO.

including dozens of cases of second-and third-degree burns. Despite knowing of this Defect, SharkNinja failed to disclose the Defect to consumers in its labeling, packaging, or marketing materials (the "**Material Omissions**"). In response, SharkNinja initiated an inadequate and untimely recall, which offers consumers no monetary refund for the Products. As a result, hundreds of thousands of dangerously defective Products will remain in American homes. Plaintiff brings suit, individually and on behalf of all others similarly situated, to seek compensation and injunctive relief to fully compensate all consumers who purchased the Products and stop SharkNinja's ongoing failure to fully remedy the Defect and protect consumers from the dangers of using the Products.

## PARTIES

### *Plaintiff Rick Tschernjawski*

2.      Plaintiff Rick Tschernjawski is a citizen and current resident of New York. Plaintiff purchased one of SharkNinja's Products from Amazon in April 2023. He paid approximately $300 for this Product.

3.      Prior to purchasing the Product, Plaintiff reviewed the Product's packaging and reviews of the Product. He also reviewed SharkNinja's website. Plaintiff observed no safety warnings, no mention of a risk of harm to him from using the Product due to its Defect, nor any mention of consumer complaints made about the Product to the Consumer Product Safety Commission. ("CPSC").

4.      Based on SharkNinja's labeling, packaging, and marketing materials, the Material Omissions, and SharkNinja's reputation as an expert on consumer kitchen appliances, Plaintiff reasonably believed the Product did not suffer from the Defect and did not pose safety risks to himself and others in his household.

2

5.     Had Plaintiff known that the Product suffered from the Defect and posed a significant safety risk to himself and other individuals he would not have purchased the Product, or would have paid significantly less for it. As such, Plaintiff has been directly financially injured by SharkNinja's deceptive and misleading advertising and defective design of the Products.

***Defendant SharkNinja, Inc.***

6.     Defendant SharkNinja, Inc. is a publicly-traded corporation incorporated in Delaware and headquartered in Needham, Massachusetts. Upon information and belief, SharkNinja's relevant business decision making, including its marketing for the Products, originated, and continues to originate, out of its Massachusetts headquarters and/or its presence in Massachusetts.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because there are 100 or more class members; at least one class member is a citizen of a state that is diverse from Defendant's citizenship; and the matter in controversy exceeds $5 million, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendant because Defendant operates, conducts and engages in substantial business in this judicial district, including, but not limited to, the promotion, sale, marketing and distribution of its Products; Defendant committed tortious acts in this State through its misrepresentations and omissions related to the sale, marketing and distribution of the Products; Defendant caused injury to persons within this State; and a substantial portion of the actions giving rise to the claims took place in this State, given Defendant is headquartered in Massachusetts.

9.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because

this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. This is especially true given Defendant is headquartered in Massachusetts.

**FACTUAL ALLEGATIONS**

**I.    SharkNinja Markets the Products for Consumers to Use in Their Homes**

10.    SharkNinja manufactures, markets and sells several substantially similar pressure-cooker Products.



11.    Launched in early 2019, the Products were aggressively marketed across various platforms.

12.    Advertisements highlighted its versatility, emphasizing the convenience of having multiple cooking methods in one appliance.

13.    SharkNinja boasted that the Products has 8-in-1 functionality, allowing users to pressure cook, steam, slow cook, sear/sauté, air crisp, bake-roast, broil, and dehydrate.

14.    In some representations of the Products state that they are able to "[r]eplace[] 14 cooking tools & appliances."





15.     Retailers like Walmart, Costco, Sam's Club, Amazon, and Target stocked the product, making it widely accessible to consumers.

16.     Priced at approximately $200, it appealed to a broad market segment seeking efficiency and value in kitchen appliances. shark

17.     The Products were a commercial success, with approximately 1,846,400 units sold in the United States since 2019.[2]

## II.    The Products Suffer from the Defect which Poses Extraordinary Safety Hazards to Consumers.

18.     Unbeknownst to consumers, the Products suffer from a Defect which puts consumers at risk of being burned.

19.     Specifically, the Defect involved a critical flaw in the pressure lid locking system, which failed to prevent the lid from being opened while the contents of the cooker were still under pressure. This defect directly violated the essential safety requirement for pressure cookers—that the lid must remain securely locked until internal pressure has safely dissipated.

20.     Pressure cookers are required to have a mechanical interlock system that ensures the lid cannot be removed when the contents are pressurized. In the case of the OP300 Series, the interlock did not engage properly or could be overridden inadvertently by users. This meant that users could twist and open the lid while the internal chamber was still under high pressure, leading to an explosive expulsion of hot steam and scalding food.

21.     The cooker was designed with a digital control panel that displayed operational modes and status. However, the sensor system responsible for detecting whether pressure had been fully released did not adequately communicate with the locking mechanism. As a result, the

---

[2] https://www.cpsc.gov/Recalls/2025/SharkNinja-Recalls-1-8-Million-Foodi-Multi-Function-Pressure-Cookers-Due-to-Burn-Hazard-Serious-Burn-Injuries-Reported.

electronic controls might have indicated that it was safe to open the lid even when residual pressure remained inside.

22.     High-quality pressure cookers often include redundant layers of protection—mechanical locks, steam venting delays, audible alerts, and visible indicators. In the OP300 Series, users could rely primarily on a single locking mechanism and electronic signal. If either failed, there was no secondary system to prevent the dangerous action of opening the lid prematurely.

23.     The physical design of the lid made it relatively easy to twist open, especially for consumers unfamiliar with how a pressure release should sound or behave. There was no firm resistance or stop when pressure remained, giving the impression that the lid was ready to open. This design failed to communicate visually or tactilely that doing so could result in injury.

24.     Due to these failures, consumers who believed it was safe to open the cooker after cooking would remove the lid, only to be immediately struck by a burst of hot steam, boiling water, and/or scalding food such as soups, stews, or oils.

25.     Injuries reported included, first-, second-, and third-degree burns, permanent scarring, and emergency room visits and hospitalizations.

26.     At the time of the recall, 106 injuries had been confirmed by the CPSC.

27.     The U.S. Consumer Product Safety Commission (CPSC) concluded that the product posed a serious burn hazard to users and did not meet safety standards for pressure-cooking appliances.

28.     SharkNinja acknowledged the defect and initiated a recall, which Plaintiff discusses in more depth later in the Complaint.

**III.    SharkNinja Knew of the Defect.**

29.     SharkNinja knew that its Products were unsafe because of a multitude of incident reports involving the Products dating back to at least March 2020.

30.    The CPSC forwards consumer complaints directly to the manufacturer of a product after it receives and reviews a complaint, especially complaints regarding safety hazards.[3]

31.    An early, publicly-available incident report made regarding the Products involved a 41-year old woman who was using the pressure cooker and, "while standing in front of the unit, its lid exploded off sending hot liquid all over her abdomen & kitchen, causing 2nd degree buns over most of her abdomen."[4]

| Incident Report Details |
| --- |

**Attachments (0)**

**Report Summary**
41 YOF was using Pressure Cooker according to manual. While she was standing in front of unit, its lid exploded off sending hot liquid all over abdomen & kitchen, causing 2nd degree burns over most of her abdomen. She was treated by medical professional.

**Product Details**
**Product Description:** Ninja Foodi Tendercrisp - Pressure Cooker
**Manufacturer/Importer/Private Labeler Name:** SharkNinja Operating LLC
**Brand Name:** Ninja
**Model Name or Number:** OP301107
**Serial Number:** A11JJ202Z4K3
**UPC Code:**
**SKU#:**
**Date Manufactured:**
**Retailer:** Target
**Retailer State:** Minnesota
**Purchase Date:** 4/26/2019
**Product Category:** Kitchen
**Product Type:** Appliances
**Product Code:** Pressure Cookers or Canners (412)

---

[3] FAQs, Saferproducts.gov,
https://www.saferproducts.gov/FAQs/FrequentlyAskedQuestions2#item2-1 (accessed March 6, 2025).

[4] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1955848.

32.    This complaint was reported to the CPSC on February 21, 2020 and reported to the manufacturer on March 12, 2020. Despite the horrific nature of the injury suffered by one of its customers, SharkNinja stood firm on the safety of the Products, as evidenced by the "Comments from the Manufacturer" listed below:

**Victims Involved**

**Injury Information:** Injury - Seen by Medical Professional
**My Relationship to the Victim:** My Client, Patient, Student, Etc. (professional relationship)
**Sex:** Female
**Victim's Age When Incident Occurred:** 41 years

**Comments from the Manufacturer/Private Labeler**

SharkNinja takes pride in the quality and safety of its products. As with all of SharkNinja's products, the OP301 complies with all applicable industry safety standards. We have reached out to the consumer and have requested the product to be returned to us for testing and inspection.

**Additional Details**

**Submitter has product?:** Yes
**Product was damaged before incident?:** No
**Product was modified before incident?:** No
**If yes to any, explanation:**
**Have you contacted the manufacturer?:** No
**If Not, Do you plan to?:** Yes

**Report Number:** 20200221-1E546-1955848
**Report Date:** 2/21/2020
**Sent to Manufacturer/Importer/Private Labeler:** 3/12/2020
**Report First Publication Date:** 3/26/2020
**Category of Submitter:** Consumer

33.    A separate consumer made an almost identical complaint to the CPSC around the same time, providing photos of the burns she suffered that required emergency medical treatment.[5]

---

[5] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1953003.

**Incident Report Details**

### Attachments (8)

Images

   

See more images...

**Report Summary**

31 YOF consumer reports that she sustains substantial 2nd degree burns on her forearms and stomach when the food cooker exploded. The food cooker had been used many times previously without an issue.

### Product Details

**Product Description:** Ninja Foodi Cooker Model OP305CO
**Manufacturer/Importer/Private Labeler Name:** SharkNinja Operating LLC
**Brand Name:** Ninja
**Model Name or Number:** OP305CO
**Serial Number:** S20JJ203Z7J3
**UPC Code:**
**SKU#:**
**Date Manufactured:**
**Retailer:** Costco
**Retailer State:**
**Purchase Date:** 12/18/2019
**Product Category:** Kitchen
**Product Type:** Appliances
**Product Code:** Pressure Cookers or Canners (412)

34.    Again, despite the horrifying injury in nearly identical circumstances, SharkNinja stood on the safety of its Products.

**Incident Details**

**Incident Description:** On Sunday, February 2nd I used the Ninja Foodi which I received as a Christmas gift and it exploded on me! My whole left forearm has 2nd degree burns, my stomach and part of my right arm as well. My children and boyfriend were 3ft away from the Ninja when this all happened and thankfully, they were not injured - just sprayed with the hot water but I have substantial injuries to my body. This should have never happened!!! It is not my first time using this product and I have made plenty of meals in it without an issue until this Sunday. Thank you, [REDACTED]

**Incident Date:** 2/2/2020

**Incident Location:** Home/Apartment/Condominium

**Victims Involved**

**Injury Information:** Injury - Emergency Department Treatment Received

**My Relationship to the Victim:** Self

**Sex:** Female

**Victim's Age When Incident Occurred:** 31 years

**Comments from the Manufacturer/Private Labeler**

SharkNinja takes pride in the quality and safety of its products. As with all of SharkNinja's products, the OP305 complies with all applicable industry safety standards. We have reached out to the consumer and have requested the product to be returned to us for testing and inspection.

**Additional Details**

**Submitter has product?:** Yes

**Product was damaged before incident?:** No

**Product was modified before incident?:** No

**If yes to any, explanation:**

**Have you contacted the manufacturer?:** Yes

**If Not, Do you plan to?:**

**Report Number:** 20200210-472E0-2147374912

**Report Date:** 2/10/2020

**Sent to Manufacturer/Importer/Private Labeler:** 3/3/2020

**Report First Publication Date:** 3/17/2020

**Category of Submitter:** Consumer

35.    These are far from the only complaints SharkNinja received about the Products and the Defect specifically, as evidenced by the CPSC's recall notice which stated that SharkNinja had

"received 106 reports of burn injuries, including more than 50 reports of second- or third-degree burns to the face or body, with 26 lawsuits filed."[6]

## IV. SharkNinja Omits Any Information from the Defect and its Associated Safety Hazards from Its Labeling, Packaging, and Marketing Materials.

36.     Despite having knowledge of the Defect no later than the date of Plaintiff's purchase, SharkNinja failed to disclose the Defect to consumers.

37.     In fact, there is no information or warning on the Defect given to consumers through SharkNinja's labeling, packaging, online or marketing materials, nor through any product descriptions on SharkNinja's website or the websites of third-party retailers.

38.     Instead, SharkNinja, for years, has made Material Omissions regarding the Products by failing to provide consumers with warnings, or any information at all, about the Defect and the associated safety hazards.

39.     Thus, consumers therefore have no reasonable way to know at the time of purchasing the Products about the Defect or the serious hazards posed by the Defect, specifically the risk of sustaining second- and third-degree burns.

40.     Instead, consumers are left to believe that the Products are safe for use at home and do not suffer from known, undisclosed defects, such as the Defect that led to the recall of the Products.

## V. SharkNinja's Marketing of the Products is Misleading to Reasonable Consumers.

41.     SharkNinja engages in deceptive and misleading advertising of the Products to promote them on the open market—all at the expense of unsuspecting consumers.

---

[6] https://www.cpsc.gov/Recalls/2025/SharkNinja-Recalls-1-8-Million-Foodi-Multi-Function-Pressure-Cookers-Due-to-Burn-Hazard-Serious-Burn-Injuries-Reported.

42.    SharkNinja's Material Omissions mislead reasonable consumers because no reasonable consumer would purchase or pay a premium price for the Products if they knew about the Defect and its attendant risks, which include the risk of suffering second- and third-degree burns on one's face and body.

43.    SharkNinja makes Material Omissions that mislead reasonable consumers because any reasonable consumer would want to know—and is entitled to know—that the Products pose serious risks to users before purchasing the Products.

44.    From SharkNinja's marketing, consumers cannot reasonably discern that the Products contain the Defect and pose serious safety risks to consumers, nor can consumers reasonably decipher from the Products himself that there is a known and hazardous Defect.

45.    Consumers do not realize that, even when the Products are used as intended, the Defect presents serious hazards and risks to humans. Consumers reasonably expect that SharkNinja—which has far greater expertise in product safety and knows and knew about the Defect and its attendant safety risks—would not advertise the Products with Material Omissions in the face of such significant safety concerns.

46.    Similarly, SharkNinja does not put consumers on notice of the Defect and attendant risks to people using the Products. SharkNinja had, and continues to have, a duty to warn consumers about the Defect because it presents a safety hazard, but it did not, and does not. In fact, SharkNinja did the opposite in its response to CPSC complaints where it said it stood by the safety of the Products.

47.    SharkNinja's failure to include information about the Defect and the attendant risks on the labels, physical packaging, online descriptions is further misleading as a Material Omission.

48.     The expectation that the Products are labeled and advertised truthfully is material to reasonable consumers' decisions to purchase the Products, particularly when the Defect makes it so that SharkNinja's Products pose a risk of harm to humans. A reasonable person would find it important to his or her purchasing decision whether the Products suffered from a Defect that posed a safety risk when used as intended.

49.     Plaintiff and the Members of the Class purchased the Products for about $200.00, a considerable premium over other pressure cookers. But for SharkNinja's Material Omissions, however, Plaintiff and Members of the Class would not have purchased the Products at the price they paid or on the terms offered. Had consumers been made aware of the Products' Defect, they would have paid significantly less for them or would have purchased different products. As a result, consumers have been financially injured by SharkNinja's labeling, online marketing and advertising practices.

**VI.     SharkNinja is Forced to Initiate a Recall, but the Recall is Untimely and Inadequate.**

50.     On May 1, 2025, SharkNinja initiated a recall in conjunction with the CPSC.[7]

51.     In the recall, SharkNinja for the first time admitted publicly, which it had known for years, that the Products contained a Defect that posed safety hazards to users, specifically serious risks of second- and third-degree burns.[8]

52.     But far from offering significant relief to consumers, SharkNinja's recall fails to provide *any* monetary relief to consumers.

---

[7] https://www.cpsc.gov/Recalls/2025/SharkNinja-Recalls-1-8-Million-Foodi-Multi-Function-Pressure-Cookers-Due-to-Burn-Hazard-Serious-Burn-Injuries-Reported.

[8] *Id.* ("Hazard: The pressure-cooking lid can be opened during use, causing hot contents to escape, posing a risk of burn injuries to consumers.").

53.     Instead, the entire "remedy" offered by the recall is as follows: "Consumers should immediately stop using the product's pressure-cooking function and contact SharkNinja for a free replacement lid. Consumers can *continue to use* the product's air frying and other functions."[9] (emphasis added).

54.     In sum, the recall explicitly keeps the dangerous Products in millions of American homes and forces consumers to actively reach out to SharkNinja for a replacement lid for the pressure cooker.

## VII.    Plaintiff Has No Adequate Remedy at Law

55.     Plaintiff seeks restitution if monetary damages are not available. Plaintiff is entitled to do so under the Federal Rules of Civil Procedure. *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 751 F. Supp. 2d 277 (D. Mass. 2010) (citing Fed. R. Civ .P. 8(d)(3); *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 544 (D.N.J. 2004) ("Under the Federal Rules of Civil Procedure, Plaintiff have the prerogative to plead alternative and even conflicting theories of recovery.")

56.     Indeed, restitution can be awarded in situations where the entitlement to damages may prove difficult.

57.     But even if damages were available, such relief would not be adequate to address the injuries suffered by Plaintiff and the Class. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

58.     Plaintiff and the Class seek all monetary and nonmonetary relief allowed by law, including restitution stemming from SharkNinja's unfair, unlawful and fraudulent business

---

[9] *Id.*

practices; declaratory relief; reasonable attorneys' fees and costs; injunctive relief and other appropriate equitable relief.

## FED. R. CIV. P. 9(b) ALLEGATIONS

59.     Although SharkNinja is in the best position to know what content it placed on its marketing materials during the relevant timeframe, and the knowledge that it had regarding the Products' Defect and attendant risks and its failure to disclose these, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity.

60.     *Who:* SharkNinja made the Material Omissions relating to the Defect and attendant safety risks. It made these Material Omissions on the Products' packaging, its website, and marketing materials, in written and electronic form.

61.     *What:* SharkNinja's conduct here was, and continues to be, fraudulent because it made Material Omissions that failed to disclose the Defect in its Products, which posed safety risks to consumers. SharkNinja's conduct deceived Plaintiff and the Class into believing that the Products possess no known defects presenting serious safety risks to consumers. SharkNinja knew that this information is material to reasonable consumers, including Plaintiff and the Class, in making their purchasing decisions; yet it omitted and continues to omit any warning that the Products contain the Defect. No reasonable consumer would expect that the Products contain the Defect which presents serious safety hazards to consumers.

62.     *When:* The Material Omissions detailed herein were made, prior to and at the point of sale, leaving Plaintiff and the Class unaware of the Defect and its attendant safety risks before purchasing the Products.

63.     *Where:* SharkNinja's Material Omissions were made on its labeling, packaging, and marketing materials, on its website and through its social media, in written and electronic

form.

64.    **How:** SharkNinja made Material Omissions regarding the Defect found in all Products, as well as the serious safety hazards attendant to the Defect, in written and electronic form on the Products' labeling, packaging, marketing materials, SharkNinja's website, and third-party retailer websites, in written and electronic form.

65.    **Why:** SharkNinja made the Material Omissions for the express purpose of inducing Plaintiff and the Class to purchase the Products, allowing SharkNinja to profit by selling the Products to nearly two million consumers.

66.    **Injury:** Plaintiff and the Class paid more for the Products than they otherwise would have absent SharkNinja's Material Omissions about the Defect and the attendant safety risks. Consumers continue to suffer economic harm by purchasing Products with the Defect that pose safety risks to consumers.

**TOLLING ALLEGATIONS**

**I.    Discovery Rule**

67.    The causes of action alleged herein accrued upon discovery of SharkNinja's Material Omissions related to the labeling, marketing, and advertising of the Products. Because of SharkNinja's Material Omissions, Plaintiff and Members of the Class did not discover, and could not have known, that the Products suffer from a Defect that poses safety risks through reasonable and diligent investigation. Reasonable and diligent investigation did not, and could not, reveal a factual basis for a cause of action based on SharkNinja's Material Omissions and concealment of the Defect.

**II.    Fraudulent Concealment**

68.    Any applicable statutes of limitation have been tolled by SharkNinja's knowing,

active, and ongoing concealment and denial of the facts as alleged herein.

69.     SharkNinja was, and is, under a continuous duty to disclose to Plaintiff and the Class the true character, quality, and nature of the Products—particularly with respect to the Defect and attendant safety risks.

70.     At all relevant times, SharkNinja knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the Products and sold the Products into the stream of commerce with the Material Omissions and Defect.

71.     Given SharkNinja's failure to disclose this non-public information, over which SharkNinja had exclusive control, about the nature of the Products, the Defect, and attendant safety risks—and because Plaintiff and the Class could not reasonably have known the true nature of the Products or the Defect posed—Plaintiff and the Class reasonably relied on SharkNinja's Material Omissions. Had Plaintiff and the Class known that the Products had a Defect which posed serious safety hazards to the public, they would have paid significantly less for the Products.

72.     Plaintiff and the Class have been kept ignorant by SharkNinja of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff and the Class could not reasonably have discovered the true nature of the Products, the Defect, and attendant risks they pose.

**III.    Estoppel**

73.     SharkNinja was, and is, under a continuing duty to disclose to Plaintiff and the Class the true character, quality, and nature of the Products. SharkNinja knowingly, affirmatively, and actively concealed the true character, quality and nature of the Products, and the concealment is on-going. SharkNinja knew of the serious safety hazards the Defect and the Products posed to consumers and has actively concealed them. Plaintiff and the Class reasonably relied on

SharkNinja's Material Omissions. For these reasons, SharkNinja is estopped from relying on any statute of limitations in defense of this action.

74.     Additionally, SharkNinja is estopped from raising any defense of laches due to its own conduct as alleged herein.

## CLASS ALLEGATIONS

75.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), on behalf of himself and the Members of the following proposed nationwide class ("**Nationwide Class**"):

> **During the fullest period allowed by law, all persons who purchased the Products in the United States for personal use and not resale.**

76.     Plaintiff also brings this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), on behalf of himself and the Members of the following proposed multi-state class ("**Multi-State Consumer Protection Class**"):

> **During the fullest period allowed by law, all persons who purchased the Products in the States of California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey and Washington[10] for personal use and not resale.**

77.     Plaintiff also brings this action pursuant to Fed. R. Civ. P. 23, on behalf of himself and the Members of the following New York class ("New York Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of New York for personal use and not resale.**

78.     The Nationwide Class, Multi-State Consumer Protection Class, and the New York

---

[10] Plaintiff seeks to certify a Multi-State Consumer Protection Class consisting of persons in the following states (and implicating the following statutes): California (Cal. Bus. & Prof. Code §§ 17200, *et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Chapter 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.).

Class are referred to collectively as the "**Class**" or "**Classes**," and the Members of the Classes are referred to as the "**Class Members**." Excluded from the Classes are the following individuals and/or entities: SharkNinja and its parents, subsidiaries, affiliates, officers and directors, current or former employees and any entity in which SharkNinja has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

79.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether class certification is appropriate.

80.    *Numerosity:* Members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. The precise number of Class Members is unknown to Plaintiff but is likely to be ascertainable via SharkNinja's records. At a minimum, there are nearly two million Class Members.

81.    *Commonality:* There are questions of law and fact common to the proposed Class(es). Common questions of law and fact include, without limitation:

      A.    whether SharkNinja's course of conduct alleged herein violates the statutory and common law claims pled in this Class Action Complaint;

      B.    whether SharkNinja knew, or should have known, its Material Omissions were false or misleading;

      C.    whether SharkNinja omitted or failed to disclose material information to Plaintiff and Class Members regarding the Products;

      D.    whether SharkNinja engaged in false, deceptive, or misleading conduct in the marketing, advertising, labeling, and sale of the Products;

      E.    whether SharkNinja was unjustly enriched by retaining monies from the sale of the Products;

      F.    whether certification of each Class is appropriate under Rule 23;

      G.    whether Plaintiff and Class Members have been injured by SharkNinja's

misconduct, and the proper measure of their losses as a result of those injuries;

H.      whether Plaintiff and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount and nature of such damages; and

I.      whether Plaintiff and the Members of each Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief.

82.     **Typicality:** Plaintiff's claims are typical of the other Class Members because Plaintiff, as well as Class Members, purchased the Products and relied on the Material Omissions made by SharkNinja about the Products prior to and at the time of the purchases of the Products. Plaintiff and the Members of each Class paid for SharkNinja's Products and would have paid substantially less for them had they known that SharkNinja's representations were untrue or deceptive, had they been made aware of the Defect and attendant safety risks presented through the use of the Products.

83.     **Adequacy:** Plaintiff will fairly and adequately protect the interests of the proposed Classes as their interests do not conflict with the interests of the Members of the proposed Classes they seek to represent, and they have retained counsel competent and experienced in class action litigation. Thus, the interests of the Members of the Classes will be fairly and adequately protected by Plaintiff and their counsel.

84.     **Predominance:** Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Class Action Complaint predominate over any individual ones. Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on SharkNinja's misconduct detailed at length in this Class Action Complaint.

85.     **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It

would be unduly burdensome to have individual litigation of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in the Class Action Complaint/lawsuit. Further, because the damages suffered by any individual Class Member may be relatively modest in relation to the cost of litigation, the expense, and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class Members may be unaware that claims exist against SharkNinja.

86.     ***Declaratory and Injunctive Relief:*** Pursuant to Rule 23(b)(2), declaratory and injunctive relief is appropriate in this matter. SharkNinja has acted, or refused to act, on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole. Unless a class-wide injunction is issued, SharkNinja will continue to advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Class Action Complaint, and Members of the Classes will continue to be misled, harmed, and denied their rights under the law. Plaintiff and the Classes do not have an adequate remedy at law because damages alone will not stop SharkNinja's unlawful misrepresentations and omissions. Additionally, Plaintiff seeks restitution if monetary damages are not available. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and the Classes.

## COUNT I
### Breach of Contract
**(*On Behalf of Plaintiff for the Nationwide Class or, in the Alternative, the New York Class*)**

87.     Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

88.     Plaintiff brings this claim himself and on behalf of the Members of the Nationwide Class . Alternatively, he brings this claim under New York law for himself and Members of the New York Class.

89.     Plaintiff and Class Members entered into contracts with SharkNinja when they

placed orders to purchase the Products. A valid contract existed between Plaintiff and the Class Members, on one hand, and SharkNinja, on the other.

90.     The contracts provided that Plaintiff and Class Members would pay SharkNinja for the Products ordered.

91.     The contracts further required that SharkNinja provide Plaintiff and Class Members with Products that were devoid of the Defect. These were specific and material terms of the contracts.

92.     Through these contracts, SharkNinja expressly warranted that the Products were fit for their intended purpose.

93.     SharkNinja made the foregoing warranties to all consumers, which became part of the basis of the bargain between Plaintiff, Class Members, and SharkNinja.

94.     Plaintiff and Class Members paid SharkNinja for the Products they ordered and satisfied all other conditions of their contracts.

95.     SharkNinja breached the contracts with Plaintiff and Class Members by failing to provide Products that did not contain the Defect. SharkNinja further breached its contracts when it failed to disclose the risks of serious harm to Plaintiff and Class Members before and at the time of purchase of the Products.

96.     SharkNinja also violated any implied covenant of good faith inherent in the contracts by selling Plaintiff and Class members Products that contained the Defect.

97.     As a direct and proximate result of SharkNinja's breaches, Plaintiff and Class Members were deprived of the benefit of their bargained-for exchanges and have suffered damages in an amount to be established at trial.

98.     On May 22, 2025, Plaintiff sent SharkNinja a notice letter notifying it of its breach. SharkNinja was further aware of its breach due to the CPSC recall and related lawsuits.

## COUNT II
### Fraud
### (*On Behalf of Plaintiff and the Nationwide Class or, in the Alternative, for the New York Class*)

99.    Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

100.    Plaintiff brings this claim himself, and on behalf of the Nationwide Class against SharkNinja. Common law fraud claims are materially similar in all fifty states. In the alternative, Plaintiff brings under New York law for himself and Members of the New York Class.

101.    As alleged above, SharkNinja made false and misleading representations to Plaintiff and other Class Members when it marketed the Products with the Material Omissions.

102.    When SharkNinja made these Material Omissions, SharkNinja knew they were false and/or acted recklessly in making them.

103.    SharkNinja's fraudulent Material Omissions were knowing and intentional and was intended to induce Plaintiff and Class Members to purchase the Products. Plaintiff and Class Members reasonably relied on the Material Omissions in purchasing the Products.

104.    SharkNinja's Material Omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff and Class Members.

105.    In addition, class-wide reliance can be inferred because SharkNinja's Material Omissions were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to buy the Products.

106.    In deciding to purchase the Products from SharkNinja, Plaintiff and Class Members reasonably relied on SharkNinja's Material Omissions to form the mistaken belief that the Products did not possess the Defect which presented serious safety hazards to consumers.

107.    SharkNinja had a duty to disclose the Defect  because it had superior knowledge and access to material facts about the Products, and a reasonable consumer could not have reasonably expected or known that the Products possessed the Defect and its attendant risks.

108.    Plaintiff and Class Members were injured as a direct and proximate result of

SharkNinja's conduct because Plaintiff and Class Members would have paid nothing or significantly less for the Products if they knew that the Products contained the Defect which presented safety risks to consumers.

109.    SharkNinja's acts were done maliciously, oppressively, deliberately, and with intent to defraud and in reckless disregard of Plaintiff's and the Class Members' rights and well-being in order to enrich SharkNinja. SharkNinja's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<u>**COUNT III**</u>
**Negligent Misrepresentation**
(***On Behalf of Plaintiff and the Nationwide Class or, in the Alternative, for the New York Class***)

110.    Plaintiff repeats the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

111.    Plaintiff brings this count on behalf of himself and the Nationwide Class against SharkNinja. Common law negligent misrepresentation claims are materially similar in all fifty states. In the alternative, Plaintiff brings this claim under New York law for himself and Members of the New York Class.

112.    As alleged more fully above, SharkNinja made false and misleading representations to Plaintiff and other Class Members when it marketed the Products with the Material Omissions.

113.    When SharkNinja made these Material Omissions, it knew or reasonably should have known that the Material Omissions were false and misleading. SharkNinja had no reasonable grounds for believing that the Material Omissions were true when made.

114.    SharkNinja intended that Plaintiff and Class Members rely on the Material Omissions. Plaintiff and Class Members reasonably relied on the Material Omissions in purchasing the Products.

115.    SharkNinja concealed information related to whether the Products possessed the Defect and the attendant safety risks.

116.    SharkNinja had a duty to disclose the Material Omissions because it had superior knowledge and access to material facts about the Products, and a reasonable consumer could not have reasonably expected or known that the Products possessed the Defect and the attendant safety risks.

117.    SharkNinja's Material Omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff and Class Members.

118.    In addition, class-wide reliance can be inferred because SharkNinja's Material Omissions were material, *i.e.*, a reasonable consumer would consider it important in deciding whether to buy the Products.

119.    Plaintiff and Class Members were injured as a direct and proximate result of SharkNinja's conduct because Plaintiff and Class Members would not have purchased the Products, or would have paid significantly less for them, if they knew the Products were dangerously defective.

<u>COUNT IV</u>
**Quasi Contract/Unjust Enrichment/Restitution**
***(On Behalf of Plaintiff and the Nationwide Class or, in the Alternative, for the New York Class)***

120.    Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

121.    Plaintiff brings this claim himself and on behalf of the Members of the Nationwide Class against SharkNinja. In the alternative, Plaintiff brings this claim under New York law for himself and Members of the New York Class against SharkNinja.

122.    As alleged herein, SharkNinja has used misleading Material Omissions on Plaintiff and Members of the Classes to induce them to purchase the Products. Plaintiff and Members of the Classes have reasonably relied on the misleading Material Omissions but have not received all of the benefits promised by SharkNinja. Plaintiff and Members of the proposed Classes have therefore been induced by SharkNinja's misleading Material Omissions about the Products and paid more money to SharkNinja for the Products than they otherwise would and/or should have

paid.

123.    Plaintiff and Members of the Classes have conferred a benefit upon SharkNinja as SharkNinja has retained monies paid to them by Plaintiff and Members of the Classes.

124.    The monies received by SharkNinja were obtained under circumstances that were at the expense of Plaintiff and Members of the Classes—*i.e.*, Plaintiff and Members of the Classes did not receive the full value of the benefit conferred upon SharkNinja. Therefore, it is inequitable and unjust for SharkNinja to retain the profit, benefit, or compensation conferred upon it.

## COUNT V
### Violation of State Consumer Protection Statutes
#### (*On Behalf of Plaintiff and the Multi-State Consumer Protection Class*)

125.    Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

126.    Plaintiff brings this claim himself and on behalf of the Members of the Multi-State Consumer Protection Class against SharkNinja.

127.    Plaintiff and Multi-State Consumer Protection Class Members have been injured as a result of SharkNinja's violations of the state consumer protection statutes listed above, which also provide a basis for redress to Plaintiff and Multi-State Consumer Protection Class Members based on SharkNinja's fraudulent, deceptive, unfair, and unconscionable acts, practices, and conduct.

128.    SharkNinja's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

129.    SharkNinja's marketing of the Products violates these prohibitions by deceiving consumers into believing that the Products do not possess the Defect and attendant safety risks when, in fact, this is not true.

130.    SharkNinja has engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of applicable law.

131.    SharkNinja engaged in misleading and deceptive advertising by using the Material Omissions. SharkNinja chose to package and market the Products in this way to impact consumer choices, extract price premiums, and gain market dominance, as it is aware that all consumers who purchased the Products would be impacted by its Material Omissions and would reasonably believe SharkNinja's false and misleading Material Omissions.

132.    SharkNinja intended that Plaintiff and other Multi-State Consumer Protection Class Members would rely upon the Material Omissions.

133.    SharkNinja's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and other Multi-State Consumer Protection Class Members to be deceived about the true nature of the Products.

134.    As a direct and proximate result of SharkNinja's violations of the laws identified in footnote 12, SharkNinja caused Plaintiff and other Multi-State Consumer Protection Class Members to have suffered ascertainable loss of money caused by SharkNinja's Material Omissions.

135.    Had they been aware of the true nature of the Products, Plaintiff and other Multi-State Consumer Protection Class Members would have paid less or nothing at all for the Products.

136.    Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and the Multi-State Consumer Protection Class Members are entitled to recover compensatory damages, restitution, punitive and special damages, including, but not limited to, treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## COUNT VI
### Violation Of New York General Business Law § 349 ("GBL")
### (*On Behalf of Plaintiff and the New York Class*)

137.    Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

138.    Plaintiff brings this claim himself and on behalf of the Members of the New York Class against SharkNinja.

139.    GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

140.    The conduct of SharkNinja alleged herein constitutes "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Class Members seek monetary damages.

141.    SharkNinja misleadingly, inaccurately, and deceptively advertised and marketed its Products to consumers through the Material Omissions, as described above.

142.    SharkNinja's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Class to purchase and pay a premium for the Products when they otherwise would not have.

143.    Plaintiff and the New York Class have been injured inasmuch as they paid a premium for Products that possessed the Defect and the attendant safety risks, contrary to SharkNinja's Material Omissions about the Products. Had they known the truth about the Products, Plaintiff and the New York Class would not have purchased at the price they paid them – *e.g.*, they paid a price premium for the Products. Accordingly, Plaintiff and the New York Class received less than what they bargained and/or paid for.

144.    SharkNinja made its untrue and/or misleading statements and Material Omissions willfully, wantonly, and with reckless disregard for the truth.

145.    As a result of SharkNinja's unlawful deceptive acts and practices, Plaintiff and the New York Class are entitled to monetary, compensatory, statutory, treble, and punitive damages, restitution and disgorgement of all moneys obtained by means of SharkNinja's unlawful conduct, interest, and attorneys' fees and costs.

146.    On May 22, 2025, Plaintiff sent SharkNinja a notice letter notifying it of its violations of the GBL.

<u>COUNT VII</u>
**Violation Of New York General Business Law § 350 ("GBL")**
**(*On Behalf of Plaintiff and the New York Class*)**

147.    Plaintiff repeats the allegations contained in the above paragraphs as if fully set

forth herein.

148.    Plaintiff brings this claim himself and on behalf of the Members of the New York Class against SharkNinja.

149.    GBL § 350 provides, in part, as follows: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

150.    GBL § 350-a(1) provides, in part, as follows:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

151.    SharkNinja made Material Omissions. Specifically, SharkNinja concealed information related to whether the Products possessed the Defect and attendant safety risks. As a result of SharkNinja's Material Omissions, reasonable consumers formed the mistaken belief that the Products were safe to use and free from the Defect and safety risks.

152.    SharkNinja's advertising of the Products induced Plaintiff and the New York Class to buy SharkNinja's Products. Thus, SharkNinja made material representations through its Material Omissions about the Products.

153.    Plaintiff and the New York Class have been injured inasmuch as they paid a premium for Products that posed contained the Defect and attendant safety risks, contrary to SharkNinja's Material Omissions regarding the Products. Had they known the truth about the Products, Plaintiff and the New York Class would have paid significantly less for the Products – *e.g.*, they paid a price premium. Accordingly, Plaintiff and the New York Class received less than what they bargained and/or paid for.

154.    SharkNinja made the foregoing untrue and/or misleading representations willfully, wantonly, and with reckless disregard for the truth.

155.    As a result of SharkNinja's unlawful deceptive acts and practices, Plaintiff and the New York Class are entitled to monetary, compensatory, statutory, treble and punitive damages, restitution and disgorgement of all moneys obtained by means of SharkNinja's unlawful conduct, interest, and attorneys' fees and costs.

156.    On May 22, 2025, Plaintiff sent SharkNinja a notice letter notifying it of its violations of the GBL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, himself and on behalf of the proposed Classes, respectfully pray for following relief:

A.    Certification of this case as a class action on behalf of the proposed Classes defined above, appointment of Plaintiff as Class representatives, and appointment of their counsel as Class Counsel;

B.    A declaration that SharkNinja's actions, as described herein, violate the claims described herein;

C.    An award of injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the proposed Classes, including, *inter alia*, an order prohibiting SharkNinja from engaging in the unlawful act described above;

D.    An award to Plaintiff and the proposed Classes of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that SharkNinja obtained from Plaintiff and the proposed Classes as a result of its unlawful, unfair, and fraudulent business practices described herein;

E.    An award of all economic, monetary, actual, consequential, and compensatory damages caused by SharkNinja's conduct;

F.    An award of nominal, punitive, treble, and statutory damages;

31

G.    An award to Plaintiff and their counsel of reasonable expenses and attorneys' fees;

H.    An award to Plaintiff and the proposed Classes of pre-judgment and post-judgment interest, to the extent allowable; and

I.    For such further relief that the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the proposed Classes, hereby demand a jury trial with respect to all issues triable of right by jury.

Dated: May 23, 2025

/s/Joel D. Smith
Joel D. Smith
Yeremey O. Krivoshey*
**SMITH KRIVOSHEY, P.C.**
867 Boylston Street, 5th Floor #1520
Boston, MA 02116
T: (617) 377-7404
F. (888) 410 0415
joel@skclassactions.com
yeremey@skclassactions.com

/s/ Zachary Arbitman
Zachary Arbitman*
George Donnelly*
**FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
F: (215) 567-8333
zarbitman@feldmanshepherd.com
gdonnelly@feldmanshepherd.com

*Attorneys for Plaintiff*

*Pro Hac Vice Applications Forthcoming